UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

VOLVO TRUCKS NORTH AMERICA   §
a division of VOLVO GROUP NORTH   §
AMERICA, LLC,   §
     Plaintiff,   §
  §      CIVIL ACTION NO:
VS.   §      1:12-cv-0448 WTL-DKL
  §
ANDY MOHR TRUCK CENTER and,   §
ANDREW F. MOHR,   §
     Defendants.   §

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO EXCLUDE EXPERT
TESTIMONY OF GARY KLEINRICHERT**

Volvo Trucks North America ("Volvo")[1] files this Reply In Support of its Motion to

Exclude the Expert Testimony of Gary Kleinrichert ("Motion to Exclude") and shows as follows:

**I.**    **Kleinrichert's Yardstick Analysis**

The law of the Seventh Circuit, as *unequivocally* expressed in this District on more than

one occasion, precludes an expert from giving testimony based on a yardstick analysis unless the

expert first demonstrates that the chosen yardstick is sufficiently comparable to the target so as to

be an accurate predictor of how the target would have performed. *CDW LLC v. NETech Corp.*,

906 F. Supp. 2d 815, 824 (S.D. Ind. 2012); *Allgood v. General Motors Corp.*, 2006 WL

2669337, at *10 (S.D. Ind. Sept. 18, 2006); *see also Loeffel Steel Prods. v. Delta Brands, Inc.*,

387 F. Supp. 2d 794, 812 (N.D. Ill. 2005).[2] "Absent the *requisite showing of comparability*, a

damage model that predicts either the presence or absence of future profits *is impermissibly*

*speculative and conjectural . . .* [and] manifestly unreliable." *NETech*, 906 F. Supp. 2d at 824

---

[1] Volvo Trucks North America has referred to itself as "Volvo Trucks" in other filings because the company is not to be confused with Volvo Car Group, which is owned by Zhejiang Geely Holding of China. To maintain consistency with the Court's preferred shorthand, Volvo Trucks will refer to itself herein as "Volvo."
[2] *Accord Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 208-09 (5th Cir. 2000).

(emphasis added); *Allgood*, 2006 WL 2669337 at *10; *Loeffel*, 387 F. Supp. 2d at 812. The yardstick methodology also requires the comparison of the target (*i.e.* AMTC) to other comparable <u>businesses</u>. *NETech*, 906 F. Supp. 2d at 82; (Kleinrichert Report, Dkt. No. 230, Exhibit 45 ¶ 11) ("The yardstick approach is based on identifying companies similar to the plaintiff's company to assess damages.")).

As demonstrated more fully in Volvo's Motion to Exclude, Kleinrichert's application of the yardstick methodology fails to meet these standards in every respect.  Instead of comparing AMTC's performance to the actual performance of other identifiable Volvo dealerships, Kleinrichert compared AMTC's share of the Indianapolis market to the average market share that Volvo achieved from year to year in Kleinrichert's choice of allegedly comparable markets. Furthermore, Kleinrichert not only failed to compare AMTC with a similarly situated Volvo dealership but he failed to compare AMTC's own share of the Indianapolis market to Volvo's share of any particular market: rather, he compared AMTC's market to a <u>hypothetical</u> "average market," which Volvo has shown in its principal brief as not representative of Indianapolis or any actual market. (Mot. Exc., Dkt. No. 279, PageID 6029-6033). Further, Kleinrichert failed to demonstrate how any of eight markets he selected as benchmarks are comparable to and, therefore, predictive of the Indianapolis market.

Kleinrichert's justification for having selected his eight markets is that they, like Indianapolis, are metropolitan markets located in the Midwest. (Kleinrichert Dep. 89:3-22, Dkt. No. 279-2). Kleinrichert claims that his yardsticks' geographic proximity to Indianapolis and to one another allows for the presumption that they are "economically similar" and that they are "impacted by similar economic events." (*Id.*) Kleinrichert provides no other support or

explanation for his assumption of economic comparability.[3]

An almost identical analysis was presented to and rejected by this District in *NETech*. In that case, plaintiff-CDW's expert attempted to calculate the profits lost by CDW's Indianapolis branch by averaging the revenue growth rate experienced by CDW's other Midwest branches and applying it to the Indianapolis branch's pre-tort revenues. 906 F. Supp. 2d at 823-24. The defendant argued that this analysis was unreliable because it was based solely on the presumption that the average revenue growth rate of the other branches was a good proxy for the revenue growth rate of the Indianapolis branch. *Id*. at 821. And the court agreed:

> [The expert's] analysis averages the revenue growth experiences of the other CDW branches, so he does not even compare Indianapolis branch to the actual experience of any other business entity. It appears that using the average revenue growth experience of the branches, rather than the actual revenue growth or decline of a particular branch, permitted [the expert] to avoid explaining how another branch's experience in any year (or over time) could appropriately be applied to Indianapolis.

Similar to Kleinrichert, CDW defended the use of the its other branches' average growth rate because (1) like the Indianapolis branch, the other branches were located in the Midwest; (2) the other branches were in the same line of business as the Indianapolis branch; and (3) the other branches had the same management and policy structure as the Indianapolis branch. *Id.* at 824. The court, however, rejected these superficial arguments: "none of these factors says anything about the market forces that affect (or affected) the revenues of any other branch and whether [those] market forces affected Indianapolis [in] even roughly the same manner as any other branch." *Id*. Therefore, neither CDW nor its expert had "offer[ed] anything . . . to establish comparability of market forces for Indianapolis to another branch or Indianapolis to a

---

[3] *See MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, at *4 (S.D. Ind. June 29, 2009) ("[A]n expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions <u>must be supported by evidence</u>.").

hypothetical 'average' branch." *Id*. at 824-25.[4]  Kleinrichert's yardstick analysis fails in the exact same respects, but in greater degrees. (Mot. Exc., Dkt. No. 279, PageID 6021-33).

## II.    AMTC's Response

AMTC rightly notes that Volvo did not challenge Kleinrichert's qualifications.  AMTC, nevertheless, expresses indignation that Volvo has the audacity to seek to exclude Mr. Kleinrichert, "a financial analyst with twenty-eight years of relevant experience whose testimony on damages has never before been excluded or limited."  (Resp., Dkt. No. 290, PageID 6385). But as explained in *NETech*, "[i]t is not a sufficient defense of Mr. [Kleinrichert]'s opinions to say he is a seasoned financial analyst or has never been disqualified to serve as a damages expert."  906 F. Supp. 2d at 821. Rather, AMTC must show that Kleinrichert reliably applied his methodology, a burden AMTC cannot carry. So, instead of establishing that Kleinrichert correctly applied his yardstick model, AMTC expresses shock that Volvo would cite *NETech* and *Eleven Line*[5] and not *Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788 (1989). AMTC's position is puzzling. *Willow* has nothing at all to do with yardstick methodology, while the cases Volvo cites expressly examine the requirements that *Daubert* places on damage experts who apply a yardstick methodology.

### A.    *Willow* is not applicable; even if it were, Kleinrichert's methodology is not consistent with the methodology approved of in *Willow*.

In *Willow*, plaintiff-dealer had a profitable business that had not been impaired by General Motors' misconduct.  The plaintiff's expert calculated lost profits by first showing that plaintiff's dealership sold 309 cars in the year preceding the alleged injury. 872 F.2d at 798.

---

[4] The *NETech* court also noted that CDW's expert, like Kleinrichert, had neither performed nor relied upon an economic analysis of the Indianapolis market or any other market. 906 F. Supp. 2d at 824; *see* 2nd Rebuttal Report of Herb E. Walter, ¶¶ 53, 54, Dkt. No. 279-5 (criticizing Kleinrichert for not analyzing Indianapolis as a truck market to determine whether it was comparable to any of the eight yardstick markets).

[5] AMTC avoids addressing the other cases from within the Seventh Circuit that hold the same and which are cited by Volvo. (Dkt. No. 279, PageID 6025 (citing *Allgood*, 2006 WL 2669337 and *Loeffel*, 387 F. Supp. 2d 794, 812)).

Plaintiff's expert *also* showed that prior to GM's wrongful acts, dealership sales had grown at a considerably greater rate than GM's aggregate national sales. *Id*. The expert then showed that post-injury, the growth rate of plaintiff's sales fell below the national growth rate. *Id*. The expert then calculated damages by determining the number of additional cars that plaintiff would have had to sell post-injury to bring its annual growth rate back in-line with the national growth rate, that is, back in-line with the growth rate that plaintiff enjoyed prior to the injury.

This is a text-book example of the "before and after" approach, a methodology that shares some conceptual similarities with the yardstick method but is fundamentally distinct. The "before and after" method for calculating lost profits compares the plaintiff's performance prior to injury with plaintiff's performance post-injury.  In *Willow*, the expert compared plaintiff's pre-injury performance (when its annual new car sale growth rate exceeded the national growth rate) with plaintiff's post-injury performance (when its annual growth rate fell below the national growth rate). 872 F.2d at 797-98. The damages calculated were considered reliable because "[the expert] relied on actual sales by plaintiff during those periods when sufficient vehicles were delivered," that is, prior to the injury. *Id*. at 797.

AMTC argues that "like the expert in *Willow*, Kleinrichert utilized a market trend to estimate the number of trucks [AMTC] would have sold but for Volvo's alleged failure of support." (Resp., Dkt. No. 290, PageID 6399). Kleinrichert does nothing of the sort.[6] Kleinrichert does not start from a baseline using AMTC's sales in a "pre-injury" year and from this calculate damages from the assumption that AMTC's future sales would grow in proportion to a market trend because AMTC had exceeded the market trend in "pre-injury" years.  That

---

[6] Indeed, nowhere in Kleinrichert's May 8, 2014 Report or in his deposition testimony does Kleinrichert claim to have done so.  The contention that Kleinrichert used a trend to make his damage calculation is nothing more than an unsupported and demonstrably false argument retrospectively asserted in an effort to make an inapplicable case appear applicable.

analysis is what the expert did in *Willow*. Kleinrichert chose eight markets and assumed that in those eight markets, Volvo provided adequate dealer support. He further assumed that Volvo did not adequately support AMTC in Indianapolis and but for Volvo's inadequate support, AMTC would have performed to the average of his eight selected markets. Kleinrichert's methodology is not a "before and after" approach. The basis of the "before and after" approach is that but for a wrongful act by the defendant the plaintiff would continue to perform as it did prior to the wrong. The basis of the "yardstick" approach is that some other business (*i.e.*, the yardstick) is of sufficient comparability to the plaintiff that the plaintiff's "but for" performance can be inferred by reference to the yardstick's performance.

Kleinrichert <u>does not</u> show that AMTC's "pre-injury" share of the Indianapolis market was historically on par with, much less greater than, Volvo's average Midwest market share. *Contra Willow*, 872 F.2d at 797 (expert's method was reliable because it "relied on actual sales by plaintiff during those periods when sufficient vehicles were delivered"). And pre-injury performance data (*i.e.* a baseline) is an absolute necessity for application of the method approved of in *Willow*; without a baseline to adjust, a sales *trend* is meaningless.

It becomes clear that no amount of posturing by AMTC can bring this case within in *Willow*'s scope because, as AMTC itself points out, the "before and after" method is not applicable here because AMTC claims injury from the time it received the Volvo franchise. (Resp., Dkt. No. 290, PageID 6396, n. 3). There is no "pre-injury" performance measure for AMTC and, thus, no baseline to adjust in accordance with a trend. The *Willow* holding has no applicability to determining whether a <u>yardstick</u> analysis has been reliably applied.

### B. AMTC's constructions of *NETech* and *Eleven Line* are preposterous

AMTC attempts to salvage Kleinrichert's analysis by arguing that the holdings in

*NETech* and in *Eleven Line* "were driven by the fact that the questionable assumptions underlying the experts' methodologies resulted in damages figures that were untethered to any real-world market." (Resp., Dkt. No. 290, PageID 6394, 6399-6402). Effectively, AMTC argues that despite the courts' detailed analysis of, and unequivocal holdings regarding, the degree of comparability that *Daubert* requires an expert to show vis-à-vis the target and the yardstick, an expert can neglect this comparison altogether as long as the damage amount appears reasonable. This is nonsense.

    **1.**    **An expert must show that the yardsticks he has chosen are sufficiently comparable to the target, irrespective of the damage figure calculated.**

According to AMTC, the only requirement imposed by *Daubert* on a damages expert is that the ultimate damage calculation appear reasonable to the Court given the facts of the case.[7] The absurdity of AMTC's argument is illuminated by general *Daubert* principles. *Daubert* case law is replete with admonitions to district courts explaining that their role as gatekeeper is limited to determining whether the expert reliably applied a reliable methodology and not to exclude or admit expert testimony based on the court's assessment of the correctness of the expert's conclusions. *See e.g.*, *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) ("The focus, of course, must be solely on principles and methodology, not on the conclusions they generate."). AMTC's argument turns this proposition on its head. If AMTC's position is followed, the Court need not consider the reliability of the expert's method if the conclusions reached appear reasonable.

---

[7] The *NETech* and *Eleven Line* courts did note that the damages those experts calculated appeared high compared to the underlying facts. *NETech*, 906 F. Supp. 2d at 834; *Eleven Line*, 213 F.3d 198, 208-09. But nothing in either opinion suggests that, but for the unreasonably high damages, the experts' testimonies would have been admitted. Moreover, the testimony of the damages expert in *Loefell* was excluded because he failed to show comparability with no accompanying commentary as to the unreasonableness of the damage amount. 387 F. Supp. 2d at 810-18.

### 2. Kleinrichert's use of "independent" checks is not a substitute for his failure to reliably apply the yardstick methodology

AMTC claims that Kleinrichert's method is reliable because it produced results that appear reasonable when compared to certain "independent checks." But a method is not reliable just because the results appear reasonable. Unfortunately, prudence demands that Volvo address Kleinrichert's "independent checks" despite their immateriality under law.

Kleinrichert states that he considered Volvo's 20 percent market share target in each of the relevant years and observes that this target is greater than the "but for" market share that he calculated. (Kleinrichert Report, Dkt. No. 230, Ex. 45, ¶ 12.a.). From that AMTC argues "how could the [C]ourt find [Kleinrichert's] more conservative figures unduly speculative?" *See Target Market Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1145 (7th Cir. 1998). "The problem with this argument," the Seventh Circuit has explained, ". . . [is that . . . [Volvo] was identifying a target [market share], not making a projection of actual [market share]." *Id*.

AMTC contends that Kleinrichert's yardstick analysis must be reliable because it produced lost unit sale estimates that are far more conservative than those used by Volvo's expert when calculating damages for Volvo's injuries incurred as result of AMTC's inability to sale trucks and keep promises. (Resp., Dkt. No. 290, PageID 6393-94, 6402).  But this argument is misleading.  As AMTC explains, Volvo's expert was using the sales projection method. (*Id*. at PageID 6393). AMTC carefully worded its argument to give the impression that Volvo's expert produced these projections to inflate Volvo's recovery. *Id*. ("Kleinrichert . . . could have simply parroted back the sales projections that Volvo's damages expert used and generated" greater damages."). AMTC glossed over the fact that Volvo's expert used Andy Mohr's own unit sales projection, not some Volvo projection. (Kleinrichert Report, Dkt. No. 230, Ex. 45 at ¶ 12.c.) ("In its Volvo Dealer Application and Information, Mohr Truck estimated that it would sell

approximately 100 new Volvo trucks in its first year of operations, 500 new Volvo trucks in its second year, and 750 new Volvo trucks in its third year.") Andy Mohr, not Volvo, made the projections that AMTC now tries to attribute to Volvo.

This so-called independent check that relies on Andy Mohr's own sales projection cannot be relied on by Kleinrichert at all. When AMTC and Andy Mohr sought judgment on the pleadings, they expressed no trepidation in arguing those exact same projections amounted to nothing more than "vague goals and projections" and "sales puffery."[8] AMTC cannot walk away from its past characterization of Andy Mohr's sales projections.  If those sales projections are mere "sales puffery" and "vague goals and projections," then Kleinrichert cannot rely on them as an "independent check." Put another way, either Kleinrichert did not know about AMTC and Andy Mohr's prior stated position or he did know about it but chose to ignore it.  Either way, it is useless as a "check" and Kleinrichert's use of it exposes more than a lack of thoroughness: It exposes a worthless "check" as purported proof to validate a model.

C.    **Kleinrichert Misapplied the Yardstick Methodology**

1.    **Kleinrichert's failed to (a) compare AMTC to an actual business; and (b) to demonstrate the soundness of the assumption underlying the comparison he did perform**

As Kleinrichert explains, "the yardstick approach is based on identifying companies similar to the plaintiff's company to assess damages."  (Kleinrichert Report, Dkt. No. 230, Ex. 45 at ¶ 11). But Kleinrichert does not compare AMTC to other businesses. Kleinrichert's model compares Volvo's average market share across his selected markets to Volvo's Indianapolis market share. And Kleinrichert's model assumes that the *only* reason that Volvo's share of the Indianapolis market is less than its average Midwest market share is that Volvo is not providing an adequate level of support to AMTC.

---

[8] *Quoting* Defendants' Brief in Support of Motion for Judgment on the Pleadings, Dkt. No. 44 at Page ID 521, 527.

Implicit in his model is a foundational assumption that all Volvo dealers in the eight "yardstick" markets (whose identity and number are unknown to Kleinrichert) are comparable to AMTC. That is, AMTC was not evaluated as a business and compared to other like businesses. Kleinrichert just assumed that AMTC and every other Volvo dealer within the eight markets are interchangeable for comparative purposes.  But it is worse.  Kleinrichert assumed that the Indianapolis market is interchangeable with any and all of his chosen eight markets.  And, of course, this assumption of interchangeability is not based on any cogent analysis or explanation; it is an inherent aspect of the model and the *ipse dixit* of Kleinrichert.[9]

Kleinrichert also recognizes that the yardstick markets are serviced by multiple Volvo dealers whereas Indianapolis is served only by AMTC. (Kleinrichert Dep. 95:24-97:3, Dkt. No. 279-2). Therefore, his model also assumes that Volvo should secure an identical market share in each market regardless of the number of dealers it has in those markets. AMTC attempts to negate this issue, in footnote 4 of its Response, but all AMTC does is restate what is presented here, that Kleinrichert's model assumes the interchangeability of dealers and further assumes that Volvo will achieve commensurate market share in comparable markets with *whatever* combination of dealers it has in those markets.  Kleinrichert had to demonstrate sufficient parity or comparability of the dealers in those eight markets to AMTC.  No doubt, AMTC would have responded that this is a daunting task but that is what has to be shown for <u>Kleinrichert's</u> model to pass muster under *Daubert*. *NETech*, 906 F. Supp. 2d at 823-24 (rejecting use of an average to avoid the need of showing comparability the yardsticks averaged).[10]

---

[9] *See MDG*, 2009 WL 1916728, at *4 ("[A]n expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence.").

[10] *See also Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. 04-4213 (JRT/AJB), 2011 WL 167259, at *8-11 (D. Minn. Jan. 14, 2011) (cited in AMTC's Resp.: "[Plaintiff] must attempt to measure its damages with reference to the performance of one or more closely comparable firms . . . [and] [a]bsent the requisite showing of comparability ... [a damage model] is impermissibly speculative and conjectural.") (quoting *Home Placement Serv., Inc. v. Providence Journal Co.,* 819 F.2d 1199, 1205–206 (1st Cir.1987) and *Loeffel.,* 387 F.Supp.2d at 812).

### 2.    AMTC blames Volvo for Kleinrichert's shortcomings

AMTC argues that Kleinrichert could not make a dealer-to-dealer comparison because Volvo would not produce the documents necessary for him to do so. (Resp., Dkt. No. 290, PageID 6407). A plain reading of Kleinrichert's Report and his deposition testimony make clear that this argument is a smokescreen. Kleinrichert describes his methodology very well:

11. To ascertain the damages sustained by Plaintiff as a result of Defendants' allegations, I have utilized a methodology consistent with the yardstick and market share approaches. The yardstick approach is based on identifying companies similar to the plaintiff's company and comparing those companies' performance to that of the plaintiff's company to assess damages. The market share approach is based on comparing the expected market share of the plaintiff's company absent the alleged conduct to the company's actual market share to assess damages.[9] In this case, I have identified similar markets to that of Mohr Truck and compared Volvo Trucks' market share in those markets to Volvo Trucks' market share in the Indianapolis market to ascertain Mohr Truck's lost sales. This methodology is consistent with both a yardstick and market share approach. . . .

13. To estimate the market share Mohr Truck should have obtained but for Volvo Trucks' alleged lack of support, I reviewed Volvo Trucks' market share in the following Midwest metropolitan areas: Chicago, Cincinnati, Cleveland, Columbus, Detroit, Lexington, Louisville, and St. Louis. Most if not all of these metropolitan areas appear to be within Mohr Truck's sales district as identified by Volvo Trucks.[15] To determine Volvo Trucks' market share in each market, I reviewed the IHS Automotive New Truck Reports for the years 2011, 2012, and 2013.[16] This data indicated Volvo Trucks' average market shares for the markets considered were 16.5%, 17.5%, and 18.7% in 2011, 2012, and 2013, respectively.

(Kleinrichert Rep., Dkt. No. 230, Ex. 45 at ¶¶ 11, 13).

Kleinrichert carried out his methodology just exactly as he described it. Nowhere in his report or during his deposition did he claim or even hint that this was a secondary methodology applied as a result of not being able to carry out a proper dealer-to-dealer comparison for want of data. In fact, at his deposition, while being questioned on this methodology, he claims to have made a dealer-to-dealer comparison between AMTC and others in relation to his first report. (Kleinrichert Dep. 234:23-235:10, Dkt. No. 291-8). Kleinrichert did not make a dealer-to-dealer comparison when applying his yardstick analysis, not because he was refused the information,

but because he deemed such a comparison irrelevant to the approach he designed and carried out. This is merely another example of a baseless, retrospective argument hashed by AMTC to excuse the flaws that render Kleinrichert's model "manifestly unreliable."[11]   *NETech*, 906 F. Supp. 2d at 824; *Allgood*, 2006 WL 2669337 at *10; *Loeffel*, 387 F. Supp. 2d at 812.

AMTC also cites cases for the proposition that an (alleged) wrongdoer cannot escape liability by arguing that the damages claimed are too speculative when the wrongdoer's acts caused the uncertainty complained of. (Resp., Dkt. No. 290, PageID 6394). But none of the cases cited come close to holding that discovery disputes can form the basis of this wrongdoing. *See e.g.*, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946). AMTC makes no showing, nor even alleges that Volvo violated discovery rules.  If AMTC legitimately believed that Volvo did not adequately respond to requested discovery, AMTC had an obligation to pursue it with counsel and, if it believed more should be forthcoming, the remedy is to file a motion to compel and obtain judicial relief.  What it ought not do is spew forth assertions of wrongdoing when no wrongdoing has occurred and, more importantly, has never been found by the Court to have occurred.  AMTC cast aspersions on Volvo in an effort to sway the Court through disparagement of a party-opponent, not by presenting cold fact.

> **D.    Even ignoring the flaws identified above, Kleinrichert's model remains unreliable because Kleinrichert has not made "requisite showing of comparability" for the yardsticks and target he bases his model on.**

Kleinrichert has not made the "requisite showing of comparability." Instead of establishing comparability, AMTC restates the same superficial arguments that Kleinrichert made during his deposition and which this District rejected in *NETech*. (Resp., Dkt. No. 290, PageID 6402; Mot. Exc., Dkt. No. 279, PageID 6025-29); *NETech*, 906 F. Supp. 2d at 823-24. Specifically, AMTC argues that the eight yardstick markets are sufficiently comparable because,

---

[11] *See supra* note 6 and accompanying text.

like Indianapolis, they are Midwestern metropolitan markets and so they presumably are impacted by the same economic conditions in the same way. (Resp., Dkt. No. 290, PageID 6402; Mot. Exc., Dkt. No. 279, PageID 6025-29). As section I. *supra* and the Motion to Exclude demonstrate the insufficiency of these arguments at length, they will not be treated here. However, it is necessary to address one of AMTC's arguments on this subject to bring to light another one of AMTC's many mischaracterizations.

### 1. Another attempt to mischaracterize Volvo's position

In its Motion to Exclude, Volvo demonstrates how Kleinrichert's own data belies his key assumption that Volvo's presumed share of his hypothetical market is predictive of the Indianapolis market. (Mot. Exc., Dkt. No. 279, PageID 6029-6033). Volvo accomplished this by showing that Kleinrichert's average Midwest market share is not representative of any actual Midwest metropolitan market[12] and, therefore, *no reason* exists to assume that the average reflects the Indianapolis market at all. Volvo also showed that in the eight markets Kleinrichert selected, the market shares vary dramatically both between markets and within the same markets over time. Thus, Volvo illustrates why *Daubert* requires damages expert to make a showing of comparability and why the *NETech* court rejected the use of an average as a means to shortcut that requirement.

The obvious unreliability of such a yardstick approach led the Fifth Circuit to make its much quoted comment: "One analytical problem and failure of [plaintiff's] proof lies in the fact that *an average of an unknown is also an unknown*." *Eleven Line*, 213 F.3d at 208-09 (emphasis added). Kleinrichert's data shows: (1) that it is *absurd* to claim that every yardstick market Kleinrichert has chosen is comparable to the Indianapolis market, at least for the purposes of predicting Volvo's likely market share in Midwest markets; and (2) that Kleinrichert's

---

[12] This statement is limited Midwest metropolitan markets for which we have data, *i.e.* the yardstick markets.

hypothetical average Midwest market is demonstrably non-predictive of *any* actual Midwest market. Therefore, <u>*no reasoned basis*</u> exists to assume that the hypothetical average will be a *reliable* predictor of Volvo's likely share of the Indianapolis market.

AMTC mischaracterizes Volvo's position by arguing that, according to Volvo, the variability in these markets "precludes the use of the yardstick approach." (Resp., Dkt. No. 290, PageID 6404). Not so. Volvo does not argue that a yardstick approach is *per se* excluded. Volvo argues that Kleinrichert failed to demonstrate that his yardstick approach was reliable. Volvo points out the absurdity of assuming the eight markets are comparable when, among other things, the data Kleinrichert found in those eight show that they differ dramatically across markets and even within the same markets over time. Volvo also points out the associated absurdity of concluding that by averaging eight widely divergent market shares, this so-called "smoothing" somehow creates a hypothetical market average that is comparable to Indianapolis.

### 2.    AMTC's cited authority supports Volvo's position

AMTC also claims that averaging the performance of truly comparable yardsticks is sometimes appropriate when applying the yardstick methodology, as if Volvo contends otherwise. Volvo's position, well supported in law, is that a damages expert cannot simply average a bunch of non-comparable yardsticks on the assumption that by doing so he accounts for the variability that renders each individual yardstick a non-comparable. [13] As shown above, AMTC misreads *Willow*. In that case, the expert applied a before and after methodology, not a yardstick methodology. The *Willow* expert did not, as AMTC's argument necessarily implies, take a brand new dealership and conclude that it would perform to the level of an "average" American dealership.

AMTC comes closer to the point, however, when it cites *Insignia Sys., Inc. v. News Am.*

---

[13] Which of course is the <u>precise</u> argument rejected in *NETech*. 906 F. Supp. 2d at 823-24.

*Mktg. In-Store, Inc.*, No. 04-4213 (JRT/AJB), 2011 WL 167259, at *8-11 (D. Minn. Jan. 14, 2011). In that case, the expert used a "cohort of other firms" as yardsticks. The opinion does not say that the expert averaged the performance of the cohort, or index, of firms.  But if he did, it does not support AMTC's position because the expert in that case showed that his yardsticks were comparable, a claim Kleinrichert cannot make.[14] Moreover, unlike Kleinrichert, the *Insignia* expert used an index of *actual businesses* as yardsticks, which, of course, highlights this flaw in Kleinrichert's yardstick analysis.

AMTC also cites *Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 121-22 (1969) in support of its argument that appropriate yardsticks vary from case to case. Volvo is not sure what point AMTC is making by citing this case.  Nevertheless, *Zenith* supports Volvo's argument not what AMTC argues.   In *Zenith*, plaintiff was injured due to the wrongful denial of a license that prevented plaintiff from penetrating as deep into the Canadian market as it had in the U.S. market. The Court permitted the plaintiff to prove damages based on a comparison of its share of the U.S. market, where it was free to compete, with its share of the Canadian market, where it had been denied a fair opportunity to compete. But again, the plaintiff first established the comparability of the U.S. and Canadian markets. *Id.* at 121 ("These officers, experienced businessmen, also testified to the similarities between the Canadian and American markets, attributing Zenith's much poorer Canadian performance to the discouraging and repressive effects of the pool.").

---

[14] True, the defendants in *Insignia* did attack the comparability of the yardsticks, but that expert, unlike Kleinrichert, was able to defend his selection of yardsticks with <u>empirical evidence</u>. *Insignia*, 2011 WL 167259 at *8-11. [14] *See also MDG*, 2009 WL 1916728, at *4 ("[A]n expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence.").

3.      **AMTC argument that that Volvo is responsible for the selection of the eight benchmark markets is deceitful**

Throughout its Response, AMTC asserts that Volvo has "deemed" the eight benchmark markets comparable to Indianapolis, that Volvo "chose" the comparable markets, that Volvo and Kleinrichert "agree" that yardsticks are comparable; and that Volvo "insist[ed] that these were the markets most comparable to Indianapolis."  (Resp., Dkt. No. 290, PageID 6386-87, 6388, 6393, 6403). To support these blatantly false representations, AMTC cites a letter from Volvo's counsel to AMTC's counsel, which in pertinent part, provides:

> If you recall from the discovery dispute in early 2013 regarding the 30(b)(6) notice, we agreed upon a five state geographical area for Volvo Trucks search parameters. Financial statements were produced for the Volvo Trucks dealers in Indiana and the adjoining four states of Ohio, Kentucky, Illinois and Michigan.

(Dkt. No. 291-1, PageID 6423).

AMTC abuses the above language in an effort to shift Kleinrichert's failures onto Volvo. As an initial matter, the language cited in no way corroborates the claim that Volvo "insist[ed]" that these yardsticks are the "most comparable" to Indianapolis; in fact, Kleinrichert's self-selected eight markets are not even mentioned in the letter.  The geographic area referred to in the letter arose as a compromise between counsel about the scope of documents Volvo was to search for in connection with a 30(b)(6) notice of deposition. (**Exhibit A**, Dkt. No. 297-1; Notice of 30(b)(6) Deposition and email exchange between counsel of January 30, 2013). Furthermore, the compromise was reached at a time when Mohr and AMTC were focused on gathering what they requested so Kleinrichert could issue a report on alleged damages from the Mack Trucks Misrepresentation prior to the April 17, 2013 mediation.[15]  Suggesting the discovery compromise

---

[15] Kleinrichert stated specifically in paragraph 8 of his first report issued on April 15, 2013: "I have not estimated the damages suffered by Mohr Trucks as a result of Volvo Trucks' failures to support Mohr Trucks."  (See redacted report on file with the Court as Dkt. No.143-1 at Page ID 2352.)

meant that Volvo chose, selected, agreed with, or insisted on selecting markets comparable to Indianapolis is deceitful.

### E.     Kleinrichert's failure to consider salient explanatory variables.

Kleinrichert illogically assumes that AMTC would perform to average despite evidence that AMTC was a less than average dealer in a more difficult than average situation. First, AMTC entered the Class 8 heavy truck business with little experience selling Class 8 trucks. (AMTC's 1st Am. Compl., Dkt.. No. 17 at ¶ 29, 46, in Case 1:12-cv-00701). Second, Volvo had virtually no market penetration when AMTC was awarded the franchise. (Exhibit A at ¶ 9 of AMTC's Mot. Leave for Sec. Am. Compl., Dkt. No. 234, PageID 9; Kleinrichert Rep., Dkt. No. 230, Ex. 45 at ¶ 9). Third, AMTC had the lowest customer service rating, measured by customers – not by Volvo, in the nation. (Mot. Exc., Dkt. No. 279, PageID 6035). Fourth, approximately half of AMTC service personnel walked out due to abysmally poor management-employee relations. (*Id.*). But despite these clear handicaps, Kleinrichert's model illogically assumes that AMTC immediately would be able to capture and sustain a share of the Indianapolis market equal to the average of the eight markets Kleinrichert chose to use when Kleinrichert did nothing to ascertain whether any Volvo dealers in those eight markets had any similarities at all to AMTC.

### F.     AMTC's parting shot to save Kleinrichert's yardstick model is meritless.

AMTC concludes its Response on this issue, by once again, blaming Volvo. (Resp., Dkt. No. 290, PageID 6405). AMTC claims that Volvo's demonstration of the unreliability of Kleinrichert's yardstick analysis is somehow ineffectual because Volvo has not provided an alternative proposal. But Volvo has no obligation to show AMTC how Kleinrichert's unreliable methodology could have been made reliable. *See 1ˢᵗ Source Bank v. First Resource Federal*

*Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) (holding that opposing party "may criticize [its opponent's] damages theories and calculations without offering alternatives").

### G.    Kleinrichert's Calculation of Lost Profits on Parts and Service Is Unreliable

#### 1.    The ATRI Data

As more fully set out in the Motion to Exclude, Kleinrichert's calculations of lost profits from parts and service are derived from the use ATRI data. However, the ATRI data on which Kleinrichert relies is inapplicable to this case. As argued in the Motion to Exclude, ATRI's cost per mile, a key foundational component of Kleinrichert's model, is comprised of costs associated with trucks and trailers. Volvo does not manufacture trailers.  Thus, the cost per mile figure is irrelevant if it cannot be filtered to reflect only the per mile costs for trucks. AMTC recognizes this fact but complains that ATRI does not provide such data, so it is unreasonable to expect Kleinrichert to use a relevant cost per mile figure. AMTC's argument is unpersuasive because it rests on the assumption that ATRI is the only source of data available.

#### 2.    Kleinrichert's reliance on AMTC's financials was not reasonable.

Kleinrichert's lost parts and service profit model relies on AMTC financial statements that are dominated by parts and service relating to AMTC's Ford operations. AMTC recognizes this fact but, again, blames Volvo. AMTC argues that because Volvo does not require dealers to provide brand specific parts and service break downs in the general course of business, it is unreasonable to expect AMTC to do so in this litigation.  This is nonsense. Andy Mohr is a sophisticated business man. It strains reason to suggest that AMTC does not know exactly who its Volvo service customers are,  what services those customers have obtained, what parts have been sold to each, and the amount of revenue generated providing these parts and service – to the penny.  All such information is readily known to AMTC through its repair orders.

The affidavit of Brad Todd, which AMTC attached to its Response, exposed the superficiality of AMTC's position. AMTC argues that it could not produce this data when Kleinrichert requested it months ago; yet, when threatened with Kleinrichert's exclusion by a motion filed on July 3, 2014, Mr. Todd purports to have summarized the proportion of Volvo sales and service to AMTC's non-Volvo sales and service by affidavit dated July 21, 2014, the intervening national holiday notwithstanding.  And Mr. Todd's affidavit only asserts that AMTC does not "generally track" Volvo-specific parts and service.  No one could honestly believe that AMTC performs service work and parts sales by word of mouth only or without some documentation of it.  On this, Mr. Todd is careful not to divulge to the Court that AMTC, indeed, has repair orders that would have shown to Kleinrichert exactly how much Volvo service and parts sales flow through AMTC.  The fact that Volvo does not require a breakout on dealer financial statements is beside the point.  AMTC has the detail; it simply chose not to avail Kleinrichert of it.

### 3.    All parts will not be purchased at AMTC

AMTC recognizes the foolishness of Kleinrichert's assumption that every part purchased to repair a truck acquired from AMTC will be procured from AMTC. AMTC nevertheless attempts to excuse Kleinrichert's allocation of all parts revenue to AMTC's lost profits by arguing that the available information does not provide a basis for adjusting the profit figure for parts purchased elsewhere. AMTC cannot credibly argue that, although it knows that all parts are not purchased at AMTC, it is reasonable to calculate damages as if all parts are purchased at AMTC because it is difficult to figure the value of parts purchased elsewhere. Again, Andy Mohr is a sophisticated businessman and AMTC obviously knows exactly what Volvo parts are sold to every Volvo customer making purchases at AMTC.

### III.     Conclusion and Prayer

For the foregoing reasons, together with arguments provided in Volvo's Brief in Support of Motion to Exclude the Expert Testimony of Gary Kleinrichert, Volvo respectfully requests that its Motion to Exclude the Expert Testimony of Gary Kleinrichert be granted.

DATED:  July 27, 2014.

Respectfully submitted,

BAKER & HOSTETLER LLP
By: */s/ David R. Jarrett*
    David R. Jarrett (No. 20609-06)
    Texas Bar No. 00792188
    811 Main Street, Suite 1100
    Houston, Texas 77002
    (713) 751-1600 (Phone)
    (713) 751-1717 (Fax)
    djarrett@bakerlaw.com

    Billy M. Donley
    Texas Bar No. 05977085 (*pro hac vice*)
    811 Main Street, Suite 1100
    Houston, Texas 77002
    (713) 751-1600 (Phone)
    (713) 751-1717 (Fax)
    bdonley@bakerlaw.com

    Attorney-in-Charge for Plaintiff

    James W. Riley, Jr. (6073.49)
    Stephanie S. Chaudhary (28785.53)
    Riley Bennett & Egloff, LLP
    141 East Washington Street
    Fourth Floor
    Indianapolis, Indiana 46204
    (317) 636-8000
    (317) 636-8027
    jriley@rbelaw.com
    schaudhary@rbelaw.com

ATTORNEYS FOR PLAINTIFF VOLVO
TRUCKS NORTH AMERICA a division of
VOLVO GROUP NORTH AMERICA, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been filed electronically on July 30, 2014. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Robert D. MacGill
Mark J. Crandley
Jessica M. Lindemann
Justin Rumer
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204

*/s/ David R. Jarrett*
David R. Jarrett (20609-06)

21